EMPLOYERS LIABILITY ASSURANCE CORPORATION, LTD.
v. EMPLOYERS MUTUAL LIABILITY INSURANCE CO.

5-2106                                    334 S. W. 2d 701

Opinion delivered April 25, 1960.

Daily & Woods, by James E. West, for appellant.

Harper, Harper, Young & Durden, for appellee.

PAUL WARD, Associate Justice. This is a Workmen's Compensation case which calls for an interpretation of Arkansas Statutes § 81-1314(a)(6), in order to determine which of the two insurance carriers (either appellant or appellee) is legally bound to pay the claimant if and when it is later determined that he has a permanent partial disability caused by an occupational disease. There is very little, if any, dispute over the essential facts.

Monte D. Cotner was employed by the Eastern Metal Products Company (hereafter sometimes referred to as "Eastern") on July 9, 1956 and worked for the same company continuously, with the exceptions hereinafter noted, until June 27, 1958 when he was discharged for violating a company rule. It is important to note that appellant, Employers Liability Assurance Corporation, Ltd., was the Compensation insurance carrier at the time Cotner began work and continued as the carrier until

November 14, 1956 at 12:01 A.M., and also that on the last mentioned date and hour the appellee, Employers Mutual Liability Insurance Company, became the Compensation insurance carrier. It is conceded that Cotner became affected with dermatitis during the time that he worked for Eastern and that dermatitis is classified as an occupational disease.

When Cotner made application for compensation benefits on the ground that he was totally partially disabled it was agreed by all parties that first there would be a determination of which insurance carrier would be liable if permanent partial disability were found to exist. That is, it was agreed by all parties that the question of liability for permanent partial disability would be postponed until it was first determined which carrier would be liabile if liability is finally established. Upon the latter issue a hearing was had before the referee who fixed liability on appellant. This determination was affirmed by the Workmen's Compensation Commission and also by the Circuit Court. From the judgment of the Circuit Court appellant prosecutes this appeal.

The answer to the question here presented depends upon the interpretation given to the statute heretofore referred to. This statute, in all material parts, reads as follows:

"Where compensation is payable for an occupational disease, the employer in whose employment the employee was last *injuriously exposed* to the hazards of such disease, and the carrier, if any, on the risk when such employee was last *injuriously exposed* under such employer, shall be liable therefor . . ." (Emphasis supplied.)

Stated very simply the question is: When was Cotner last injuriously exposed? It is undisputed that Cotner became affected with dermatitis prior to November 14, 1956, but the troublesome question is was he *injuriously exposed* after that time. In order to determine the question it is necessary to examine carefully the testi-

mony relative to his exposures. In substance the record shows the following: Cotner became affected with dermatitis by reason of having been exposed to a ''degreaser'' which contains certain oils which in turn caused a rash to break out on his limbs and his body. He began working on July 9, 1956 but was not exposed to the ''degreaser'' until sometime in early October. Something like ten days after Cotner was exposed he noticed a body rash, and on October 11th he was examined by Dr. Lockwood. The doctor in his written reports stated that Cotner had contracted dermatitis but that no permanent defect would result and that there was no disability. Cotner continued to work but he was still bothered with the rash and on November 6, 1956 he was examined by Dr. Glenn who was of the opinion that Cotner was sensitive to the degreasing solution used in the ''degreaser''; Dr. Glenn next saw Cotner on November 14, 1956 when he found that Cotner's condition was considerably improved and that he had no disability. Up until this time Cotner had continued to work steadily. After November 13, 1956 the record shows that on November 14, 1956 Cotner worked in the polishing and buffing department and that on November 15, 1956 he was transferred to the ''basket line'' where he worked for two or three days and where he was exposed to the degreasing solution, he became worse on November 18, 1956 and was sent to the hospital on November 18, 1956; on November 24, 1956 Cotner was discharged from the hospital and on the 28th day of the same month he went back to work and continued to work until December 14, 1956 when the plant shut down and Cotner was laid off for a while. On January 15, 1957 Dr. Glenn who had examined Cotner several times examined Cotner and found that he was ''healed'' and was dismissed from the treatment but advised to avoid the degreasing solution. About a week later, January 21, 1957, Cotner returned to work and soon had a recurrence of the rash; on January 31, 1957 Dr. Glenn saw Cotner and referred him to Dr. Shirmer. Cotner continued to work at the same place

until June 27, 1958 when he was discharged for violating a company rule.

Keeping in mind that neither of the two insurance carriers involved will be liable unless it is later established that Cotner has been permanently partially disabled, it seems to follow that the judgment of the trial court must be reversed. Although it may be conceded that Cotner became affected with dermatitis prior to November 14, 1956, there is no evidence that he was *permanently affected*. On the other hand the evidence is all to the effect (as heretofore set out) that he was not permanently affected. Therefore, the only logical conclusion deducible is that, if the claimant is later found to be permanently affected, he became so after November 14th. All authorities appear in agreement that the date of the first recognized appearance of symptoms of an occupational disease does not necessarily coincide with the date of the last "injurious exposure". In some instances, we can conceive, the dates might coincide but this fact would have to be shown by competent evidence — a thing that was not done in the case before us. Any other view, it seems to us, would have to be based on the assumption that an occupational disease (dermatitis in this instance) is an incurable disease and that the *first* injurious exposure always results in a permanent disability. If that were the case, however, then Section 81-1314(a)(6) would be unintelligible because it speaks of a *last* injurious exposure. If there can be a *last* exposure then there can also be a *first* exposure. The case of *Textileather Corp.* v. *Great American Indemnity Co.,* 108 N. J. L. 121, 156 A. 840, recognized that an occupational or industrial disease is not always permanent or incurable by the statement that "Sometimes a patient makes a complete recovery, sometimes it is only an apparent one."

Most authorities seem to agree that the date which determines liability is not the date when the symptoms of the disease first appear but rather the date when some kind of disablement (such as cessation from work) occurs.

In *Underwriters at Lloyd's, London* v. *Alaska Industrial Board*, (D. C. Alaska), 160 F. Supp. 248, the Court used this language: "In occupational disease cases there is generally a long period of exposure without any disability and the date of contraction of the disease is not ascertainable. Therefore, there has been difficulty in determining the moment when an employer and insurer become liable. The solutions which have been worked out are discussed by Larson in the second volume of his Workmen's Compensation Law. Section 95.21 says that most frequently liability is assigned to the carrier who was on the risk when the disease resulted in *disability*, if the employment at the time of disability was of a kind contributing to the disease." (Emphasis supplied.) In the case of *Masco* v. *Barnett Foundry & Machine Co.*, 53 N. J. Super. 414, 147 A. 2d 579, where the Court had under consideration the question similar to the one here presented, it is stated: ". . . full liability for permanent disability (fastens) upon that insurer which was on the risk at the time the employee ceased work, absolving any prior insurers regardless of the extremity of progression of the disease, short of cessation of work . . ." In that case the Court assigned the reason for so holding in saying that: "Because the development of occupational diseases is characteristically gradual, but variable in different diseases and with different persons, the earlier stages being frequently undetectable, the only rule which would insure the benevolent legislature objective of recovery in every meritorious case was one which would fix liability at the single and easily determinable point when there was *inability to work* or death." (Emphasis supplied.)

In the case under consideration it is admitted that Cotner lost no time from work prior to November 14, 1956 when appellant ceased to be the insurance carrier. It is also admitted that after said date Cotner worked for Eastern, that he was exposed to the degreasing solution, and that for the first time he quit work and went to the hospital.

Appellee contends that the case of *Hixson Coal Co.* v. *Furstenberg,* 225 Ark. 568, 284 S. W. 2d 120, is authority for the affirmance of the judgment of the trial court, but we do not agree. Our attention is directed to the circumstance that the claimant contracted silicosis in that case while in the employment of Hixson but that his disability did not commence until he was working for a subsequent employer. This is true but it also appears from a careful reading of that case that the claimant was not "exposed" during his subsequent employment to anything that would cause silicosis. It further appears from the Hixson opinion that the claimant not only suffered *symptoms* of silicosis while he was in the employment of Hixson but that "he was bothered with breathlessness; it progressed to such an extent that he could not walk out of the Hixson Mine without resting, and finally got to the point that it became necessary to ride out, being unable to walk." The opinion further reflects that the claimant had formerly made a statement in 1949 to the effect that he was compelled to terminate his employment with the Hixson Company due to the fact that his physical condition had progressed to a point where he was unable to perform his work. As we read the *Hixson* case, *supra,* therefore, we construe it to confirm rather than refute the conclusion which we have heretofore reached.

From the above it follows that the judgment of the trial court must be, and it is hereby, reversed and remanded for further proceedings consistent with this opinion.

Reversed and remanded.